UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

TERRY WALL, JR.,
and JACALYNN WALL,

                Debtors.
_____/

STUART A. GOLD, TRUSTEE,

           Plaintiff,

vs.

TERRY LEE WALL, SR.,
and JUDITH A. WALL,

          Defendants.
_____/

Case No. 23-45894

Chapter 7

Judge Thomas J. Tucker

Adv. No. 23-4366

**OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I. Introduction**

      This is a fraudulent transfer case. The Defendants, Terry Lee Wall, Sr. and Judith A.

Wall, are the parents of the Chapter 7 Debtor Terry Wall, Jr. Before he filed bankruptcy, the

Debtor held a one-third ownership interest in certain unencumbered real property, which he

owned jointly with his parents. In 2020, before filing bankruptcy, the Debtor transferred his one-

third interest in the real property to his parents, and received nothing in exchange for the transfer.

It is undisputed that at the time of the transfer the Debtor was insolvent, or was rendered

insolvent by the transfer. Shortly after the transfer, the Debtor's parents sold the real property for

$51,000.00, and retained all of the sale proceeds.

      In this adversary proceeding, the Plaintiff Trustee seeks to avoid the Debtor's transfer as a

fraudulent transfer, and to recover one-third of the sale price of the property for the benefit of the bankruptcy estate.[1] This adversary proceeding is before the Court on cross-motions for summary judgment.[2]

The single count in the Plaintiff Trustee's amended complaint alleges that the Debtor's transfer of the real property is avoidable as a fraudulent transfer under the combination of 11 U.S.C. § 544(b) and Michigan law, on three theories: (1) as an intentionally fraudulent transfer (a transfer made by the Debtor "[w]ith actual intent to hinder, delay, or defraud" his creditors), under Mich. Comp. Laws § 566.34(1)(a); (2) as a constructively fraudulent transfer under Mich. Comp. Laws §§ 566.34(1)(b); and (3) as a constructively fraudulent transfer under Mich. Comp. Laws § 566.35(1).

In his motion for summary judgment, the Plaintiff seeks a money judgment in the amount of one-third of the sale proceeds, jointly and severally against the Defendants, based on the constructive fraudulent transfer claims. In their motion for summary judgment, the Defendants seek summary judgment on all of the Plaintiff's claims.

After the parties filed their summary judgment motions, the Plaintiff abandoned his intentional fraudulent transfer claim, and asked the Court to dismiss it.[3] So the Court will dismiss that claim.

As for the Plaintiff's constructive fraudulent transfer claims, the summary judgment

---

[1]  *See* Am. Compl. (Docket # 13).

[2]  Docket ## 27, 30.

[3]  *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Docket # 34) at pdf pp. 5-6 ("Plaintiff abandons his intentional avoidable transfer claim under [Mich. Comp. Laws §] 566.34(1)(a).").

2

motions focus on the disputed issue of whether the Debtor Terry Wall, Jr. received "reasonably equivalent value" for his transfer to his parents of his one-third interest in the real property at issue. That is the only element in dispute, at least as to the Plaintiff's constructive fraudulent transfer claim under Mich. Comp. Laws § 566.35(1).

For the reasons discussed below, the Court concludes that the Debtor did not receive reasonably equivalent value for the transfer of this one-third interest in the real property to the Defendants. Because of this, and because it is undisputed that the Plaintiff has established all of the other elements of his constructive fraudulent transfer claim, the Court will grant the Plaintiff's motion for summary judgment, and deny the Defendants' motion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). As to each of the claims in Plaintiffs' complaint,[4] this is a core proceeding under 28 U.S.C. 157(b)(2)(H).

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11. *See* 28 U.S.C. § 1334(b). Matters within either of these categories are deemed to be core proceedings. *Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, including the provisions of 11 U.S.C. §§ 544(b), and 550. This proceeding is one "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise

---

[4] There is only one count in the Plaintiff Trustee's amended complaint. It is entitled "Count I Avoidable Transfer." (*See* Docket # 13 at 4 (underlining and bold removed).) As discussed above, Count I actually contains three claims, each seeking avoidance and recovery of the transfer at issue.

only in bankruptcy cases." *Id.*

For these reasons, this Court has statutory authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on all of Plaintiff's claims. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462 (2011), such a problem does not exist in this case. This is because all of the parties have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[5] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on all of the Plaintiffs' claims. *See Ralph Roberts Realty, LLC v. Savoy* (*In re Ralph Roberts Realty*), 562 B.R. 144, 147-48 (Bankr. E.D. Mich. 2016) (discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015)); *Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 376 (Bankr. E.D. Mich. 2018); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr. E.D. Mich. 2018).

## III. Facts

The material facts are not in dispute.

## A. The Defendants' March 22, 2017 transfer of real property to the Debtor

On March 22, 2017, the Defendants, Terry L. Wall Sr. and Judith A. Wall, transferred to their son, the Debtor Terry L. Wall, Jr. (the "Debtor"), a one-third interest in real property they owned, located at 17445 Lincoln, East Pointe MI 48021 (the "Property"). Such transfer was made by quit claim deed (the "2017 Quit Claim Deed"), which recited that it was "for the full

---

[5] *See* Report of Parties' Rule 26(f) Conference (Docket # 7) at 3 ¶ 3(g).

4

consideration of: One ($1.00) Dollar."[6]  The 2017 Quit Claim Deed was drafted by an attorney

and entitled "**QUIT CLAIM DEED - STATUTORY FORM**."[7]  This Deed was accepted by the

Debtor,[8] and was recorded at the register of deeds for Macomb County, Michigan on April 26,

2017.[9]

## B.  Background regarding the Property

The Defendants had purchased the Property on May 9, 1990, when the Debtor was eleven

years old.  The Defendants had paid in full all of the mortgages on the Property by 2008 or 2009,

so at the time of the March 22, 2017 transfer, there were no mortgages on the Property.[10]  The

Debtor did not make any contributions toward the purchase of the Property or toward paying off

the mortgages on the Property.

Sometime in or before 2011, the Debtor, who had been living elsewhere in a home he had

purchased, moved into the Property, after losing his own home in a foreclosure sale.  In 2011, the

Defendants, who still owned the Property, moved out of the Property, and into their current home

located in New Baltimore, Michigan.  The Debtor continued to live at the Property after his

parents moved out.  After the Debtor got married in 2015, he lived at the Property with his wife,

---

[6]  2017 Quit Claim Deed (Docket # 31-4) (transferring the Property from "Terry L. Wall Sr. and Judith A. Wall, husband and wife" to "Terry L. Wall Sr. and Judith A. Wall, husband and wife and Terry L. Wall Jr., as joint tenants").

[7]  *Id.* (capitalization and bold in original).

[8]  Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 22.

[9]  *See* 2017 Quit Claim Deed (Docket # 31-4).

[10]  *See* Docket # 42 (Am. Decl. of Terry Lee Wall, Sr.) at pdf p. 1 ¶ 6 ("All mortgages on the Property were paid in full by my spouse and me in either 2008 or 2009."); Docket # 43 (Am. Decl. of Judith A. Wall) at pdf p. 1 ¶ 6 (same).

5

the Joint Debtor in the main bankruptcy case, and their children. The Debtor and his family were living at the Property at the time of the March 22, 2017 transfer.

### C. The reason for the Defendants' March 22, 2017 transfer to the Debtor

According to the declarations under penalty of perjury filed by each of the Defendants in this adversary proceeding, at the time of the March 22, 2017 transfer, the Defendants intended to give the Debtor an ownership interest in the Property so that he would be able to claim the real estate tax Homestead Exemption in the Property, and thereby obtain a significant real estate tax savings for himself and the Defendants. According to the Defendants, an employee of the taxing authority (the City of Eastpointe, Michigan) had advised them that the person residing at the Property could not claim the Homestead Exemption unless that person was an owner of the Property, and that without the Homestead Exemption, the taxes on the Property would increase significantly. According to the Defendants, the taxing authority employee suggested that they put the Debtor's name on the deed to the Property so he would be an owner who could claim the Homestead Exemption. Each of the Defendants filed a declaration under penalty of perjury which states, in relevant part:

> 14. My spouse and I were told by the City of Eastpointe that the Property would lose its status as a homestead unless it were titled to a person who actually lived there.
>
> 15. My spouse and I were told that if the Property were not considered a homestead, the property taxes on it would increase significantly.
>
> 16. An employee of the City of Eastpointe suggested that Terry Lee Wall, Jr.'s name be put on the deed to the Property so that the Property would maintain its homestead status.
>
> 17. On March 22, 2017, my spouse and I quitclaimed the

6

Property to Terry Lee Wall, Jr. and ourselves.

18.    The purpose of the March 22, 2017, quit claim deed was to maintain the homestead status of the Property.[11]

## D.  Payment of rent for, real estate taxes on, and improvements to the Property

In their declarations, the Defendants allege that the Debtor and/or his wife paid them rent sporadically while living on the Property, but that the total rent payments to them was "probably less than $1,000.00."[12]  But nowhere do they say that there was any agreement requiring the Debtor to pay the Defendants any rent.  There is no evidence of any such agreement.  The Debtor paid the utilities while living at the Property,[13] even though there is no evidence of any agreement requiring the Debtor to pay the utilities.

The Debtor testified that there was no writing indicating what he was supposed to pay and what he was not supposed to pay, after the Debtor received a one-third interest in the Property by the 2017 Quit Claim Deed.[14]  In any event, the Debtor's wife paid the 2017 property taxes on the Property, and the Debtor paid the 2018 property taxes on the Property.  This is undisputed.[15]

_____

[11]  Docket # 42 (Am. Decl. of Terry Lee Wall, Sr.) at pdf p. 2 ¶¶ 14-18; Docket # 43 (Am. Decl. of Judith A. Wall) at pdf p. 2 ¶¶ 14-18.

[12]  Am. Decl. of Terry Lee Wall, Sr. (Docket # 42) at pdf p. 2 ¶ 23; Am. Decl. of Judith A. Wall (Docket 43) at pdf p. 2 ¶ 23.  The Debtor testified that he never paid the Defendants any rent while he was living on the Property.  (Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot for Summ. J.)) at 74-75).

[13]  Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot for Summ. J.)) at 23-24.

[14]  *See id.* at 24.

[15]  The Defendants' attorney admitted this during the hearing.  The Defendants had originally declared under penalty of perjury that they paid the 2018 property taxes on the Property.  (*See* Decl. of Terry Lee Wall, Sr. (Docket # 31-1) at pdf  p. 2 ¶ 30 ("The 2018 property taxes on the Property were paid by me and my spouse, despite the fact that the March 3, 2020, receipt from the Macomb County Treasurer, shows that Terry Lee Wall, Jr. paid it."); Decl. of Judith A. Wall (Docket # 31-2) at pdf p. 2

7

During the time when the Debtor was part owner of the Property, and resided on the

Property with his family, no improvements to the Property were made other than some painting

that was done by the Debtor.[16]

## E.  The Debtor's October 13, 2020 transfer of the Property back to the Defendants

Sometime in March 2020, the Debtor and his wife and children moved out of the

Property, due to concerns about crime in the neighborhood.[17]

On September 8, 2020, the Debtor executed a quit claim deed transferring his one-third

interest in the Property back to the Defendants (the "2020 Quit Claim Deed"), for the stated "full

consideration of: One ($1.00) Dollar" (the "2020 Transfer").[18]  The 2020 Quit Claim Deed was

---

¶ 30 (same).)  But then the Plaintiff Trustee filed evidence showing that the Debtor paid those taxes. (*See* Docket # 38-1 (Ex. J (Receipt of the Macomb County Treasurer)) at pdf p. 2 (showing that $3,486.48 was received on March 30, 2020 from the Debtor Terry Wall, Jr. for "2018 Delinquent Real Property Tax"); Docket # 38-1 (Ex. K (pages 1 through 3 of the Debtor's Extra Credit Union Account statement)) at pdf p. 5 (stating "Withdrawal ACH Macomb County TYPE: Delq Tax CO: Macomb County" in the amount of $3,486.48, that was posted on March 2, 2020).)

> After the Plaintiff filed the evidence establishing that the Debtor, and not the Defendants, paid the 2018 property taxes on the Property, each of the Defendants filed amended declarations in which each of the Defendants amended their statements in paragraph 30 of their prior declarations to state:

>> When I signed the Declaration . . .  on February 27, 2024, I sincerely believed that my spouse and I paid the 2018 property taxes on the Property, especially since Terry Lee Wall, Jr. testified at his January 30, 2024, deposition that he did not pay the property taxes for that year and that he did not know whether his spouse paid them. Terry Lee Wall, Jr. seldom paid for things, forcing my spouse and I to pay.

(*See* Am. Decl. of Terry Lee Wall, Sr. (Docket # 42) at pdf  p. 2 ¶ 30; Am. Decl. of Judith A. Wall (Docket # 43) at pdf p. 2 ¶ 30.)

[16]  Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot for Summ. J.)) at 26.

[17]  *Id.* at 81-82.

[18]  A copy of the 2020 Quit Claim Deed is in the record at Docket # 27-6 (Ex. D to Pl.'s Mot for Summ. J.), and also at Docket # 31-7.

drafted by the same attorney who drafted the 2017 Quit Claim Deed, and was entitled "**QUIT CLAIM DEED - STATUTORY FORM**."[19]  On the 2020 Quit Claim Deed, the Defendants claimed an exemption for the 2020 Transfer from the "Real Estate Transfer Tax" under Mich. Comp. Laws §§ 207.505(a) and 207.526(a).[20]  These Michigan statutes exempt transfers of real property from the payment of a real estate transfer tax, "where the value of the consideration is less than $100.00."[21]  In fact, the Defendants each have expressly admitted that "the Debtor did not receive any money, property or other value from you in exchange for the [Transfer]."[22]  And the Defendants' attorney repeated this admission during the hearing on the motions.  The 2020 Quit Claim Deed was recorded with the Macomb County, Michigan Register of Deeds on October 13, 2020.[23]

**F.  The Defendants' November 20, 2020 sale of the Property and retention of all the sale proceeds**

On November 20, 2020, the Defendants sold the Property for $51,000.00.[24]  The Defendants retained all of the proceeds from the sale of the Property.

**G.  The Debtor's financial problems at the time of the 2020 Transfer**

---

[19]  2020 Quit Claim Deed (Docket ## 27-6, 31-7) (capitalization and bold in original).

[20]  *Id.*

[21]  Mich. Comp. Law § 207.505(a); *see also* Mich. Comp. Laws § 207.526(a) (which provides an exemption from the tax imposed by the State Real Estate Transfer Tax Act for "[a] written instrument in which the value of the consideration for the property is less than $100.00").

[22]  Defs.' Resp. To "Corrected" Pl.'s Req. For Admis. (Docket # 16) at 1-2 (Req. To Admit No. 2, Answer to Req. To Admit No. 2).

[23]  Docket # 31-7.

[24]  *See* Docket # 27-7 (Ex. E to Pl.'s Mot. for Summ. J.) (closing statement).

9

During the months leading up to the Debtor's 2020 Transfer, and thereafter, the Debtor was having financial problems. On April 9, 2020, the Debtor and his wife took out "an emergency loan" from Extra Credit Union in the amount of $5,000.00.[25] Eventually, on July 5, 2022, Extra Credit Union filed a four-count complaint against the Debtor and the Joint Debtor in the 42-2 District Court in the state of Michigan, commencing Case No. 22-1091, to collect on four loans that were in default (the "State Court Case").[26] Counts I and II of the complaint in the State Court Case were only against the Debtor, and Counts III and IV of the complaint were against both the Debtor and his wife. On March 1, 2023, a default judgment was entered against the Debtor and in favor of Extra Credit Union in the amount of $16,855.89 in the State Court Case.[27] In May and June of 2023, the Debtor's wages were garnished by Extra Credit Union to collect on the judgment.[28] When asked why he did not make the payments on his loans to Extra Credit Union when they were due, the Debtor stated: "I didn't have the money evidently."[29]

On July 3, 2023, the Debtor and his wife filed a voluntary petition for relief under Chapter 7, commencing Case No. 23-45894. The "[P]laintiff has identified creditors with open revolving credit accounts with balances owed on September 8, 2020 [(the date of the execution of 2020 Quit Claim Deed)] and October 18, 2020 [five days after the date of recording that deed]

---

[25] Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot for Summ. J.)) at 34-35.

[26] *See* Docket # 27-8 (Ex. F to Pl.'s Mot. for Summ. J.).

[27] *See* Docket 27-9 (Ex. G to Pl.'s Mot. for Summ. J.) at pdf pp. 4-5.

[28] *See id.* at pdf p. 6.

[29] Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 57-58.

who remain[ed] unpaid on the bankruptcy petition date."[30]  Of sixteen proofs of claim filed in the Debtor's bankruptcy case, five are against the Debtor, and the claimants who filed those claims held those claims at the time of the 2020 Transfer, and those claims remain unpaid.[31]

## IV.  The cross-motions for summary judgment

The Plaintiff filed a motion for summary judgment based only on his constructive fraudulent transfer claims.[32]  The Plaintiff argues that he has satisfied all of the elements for avoidance of the 2020 Transfer under Mich. Comp. Laws §§ 566.34(1)(b) and 566.35(1).

The Defendants' summary judgment motion seeks summary judgment on all of the Plaintiff's fraudulent transfer claims.[33]  As for the Plaintiff's constructive fraudulent transfer claims, the Defendants argue that "the Debtor received reasonably equivalent value for the 2020 [T]ransfer of the Property."[34]  As explained below, the Defendants base their argument on "the doctrines of contribution and unjust enrichment."[35]

On May 1, 2024, the Court held a hearing on the summary judgment motions, and then took the motions under advisement.

## V.  Discussion

## A.  Summary judgment standards

---

[30]  Pl.'s Objs. and Resps. to Defs.' First Set of Interrogs. to Pl. (Docket # 25) at pdf p. 3.

[31]  *Id.*

[32]  Docket # 27.

[33]  Docket # 30.

[34]  *Id.* at pdf p. 2 ¶ 11.

[35]  Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 30) at pdf p. 5.

In considering whether summary judgment should be granted for either side, the Court applies the standards governing motions for summary judgment under Fed. R. Civ. P. 56, which the Court described in detail in its prior opinion in the case of *Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 376-77 (Bankr. E.D. Mich. 2018), and which the Court now incorporates by reference. Those standards include, among other things, the requirements that in deciding each summary judgment motion, (a) the Court "'must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party[,]'" *Schubiner*, 590 B.R. at 376 (citation omitted); and (b) the Court "must 'believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant.'" *Id.* at 377 (citations omitted).

## B. Bankruptcy Code § 544(b)(1) and applicable Michigan law

Plaintiff's constructive fraudulent transfer claims are based on a combination of 11 U.S.C. § 544(b)(1) and Michigan law. Section 544(b)(1) states:

> [With an exception not applicable here], the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). The "applicable law" the Plaintiff relies on is Michigan's Uniform Voidable Transactions Act (the "MUVTA"), and specifically, Mich. Comp. Laws §§ 566.34(1)(b) and 566.35(1). Section 566.34(1)(b) states, in relevant part:

> (1) [With an exception not applicable here], a transfer made . . . by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made[,] . . . if the debtor made the transfer . . . in either of the following circumstances: . . . .
>
> (b) Without receiving a reasonably equivalent value in exchange

12

for the transfer[,] . . . and the debtor did either of the following:

*(i)* Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

*(ii)* Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Mich. Comp. Laws §  566.34(1)(b).

Section 566.35(1) states, in relevant part:

(1) A transfer made . . . by a debtor is voidable as to a creditor whose claim arose before the transfer was made[,] . . .  if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mich. Comp. Laws §§ 566.35(1).

The Trustee "has the burden of proving the elements of the claim for relief [under Mich. Comp. Laws §§  566.34(1) and 566.35(1)] by a preponderance of the evidence." *See* Mich. Comp. Laws §§ 566.34(3), 566.35(3).

## C. The Trustee has established, beyond any genuine dispute, all of the necessary elements for avoiding the 2020 Transfer under Mich. Comp. Laws § 566.35(1).

The Court concludes that based on the undisputed facts, the Trustee has established, beyond any genuine dispute, all of the necessary elements for avoiding the 2020 Transfer under Mich. Comp. Laws § 566.35(1), quoted above.[36]  For this reason, the Court will grant summary judgment for the Trustee, avoiding the 2020 Transfer.

---

[36]   In light of this, the Court does not need to decide whether the 2020 Transfer also is avoidable based on Mich. Comp. Laws § 566.34(1)(b).

13

First, as discussed below, the Debtor made the 2020 Transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer."  This element is the only element of the Plaintiff's constructive fraudulent transfer claim that is even arguably disputed by the Defendants.

Second, as discussed below, "the [D]ebtor was insolvent" at the time of the 2020 Transfer "or the [D]ebtor became insolvent as a result of" the 2020 Transfer.

Third, the Transfer was of an interest of the Debtor in the Property.

Fourth, the Transfer was made on October 13, 2020 when the 2020 Quit Claim Deed was recorded, which was within 6 years before the date the Debtor filed his bankruptcy petition.  *See* Mich. Comp. Laws §§ 566.39(a), 600.5813.

Fifth and finally, there were creditors who had claims against the Debtor before the Transfer was made.

**D.  The insolvency element is established.**

When he made the 2020 Transfer on October 13, 2020, the Debtor was "insolvent," within the meaning of Mich. Comp. Laws § 566.35(1).  And even if the Debtor was not insolvent when he made the transfer, the Debtor certainly "became insolvent as a result of" the 2020 Transfer.  The Trustee has demonstrated this, and the Defendants do not dispute it.

Insolvency is defined in Mich. Comp. Laws Ann. § 566.32(1): "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." "'Asset' means property of a debtor," but "does not include" property "to the extent it is encumbered by a valid lien" or property "to the extent it is generally exempt under nonbankruptcy law."  *See* Mich. Comp. Laws Ann. § 566.31(1)(b).

14

And a debtor is "presumed to be insolvent" if the debtor "is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute . . . ." Mich. Comp. Laws Ann. § 566.32(2). When such a presumption arises, it must be rebutted by a preponderance of the evidence. *See id.*[37]

The undisputed evidence shows the Debtor's insolvency. First, as the Plaintiff's summary judgment motion demonstrates, without any dispute by the Defendants, at the time of the 2020 Transfer, the Debtor had unsecured debts totaling at least $29,959.09, which remained unpaid as of 2023, when the Debtor filed bankruptcy.[38]

The existence of these debts prior to the time of the 2020 Transfer, and the fact that they still remained unpaid when the Debtor filed bankruptcy in 2023, shows that at the time of the 2020 Transfer, the Debtor was not paying his debts as they came due. Nor was there any bona fide dispute about these debts. And specifically as for the Debtor's debt to Extra Credit Union on four loans, on which the creditor later obtained a default judgment for $16,855.89,[39] the Debtor testified that he owed on these loans at the time of the 2020 Transfer, and did not pay them because he did not have the money.[40]

Based on these facts, the statutory presumption arises that the Debtor was "insolvent"

---

[37] "A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence." *Id.*

[38] *See* Docket # 27 at pdf p. 14 (listing claims of Extra Credit Union; LVNV Funding/Bank of America; State of Michigan Department of Treasury; LVNV Funding/Webbank; and LVNV Funding/Citibank, which total $29,959.09).

[39] *See* discussion in Part III.G of this Opinion, above.

[40] *See* Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 48-50.

15

when he made the 2020 Transfer.  The Defendants have made no effort to rebut that

presumption.  They have not presented any evidence to try to meet their burden to rebut that

presumption of insolvency.

Second, the value of the Debtor's "assets" at the time of the 2020 Transfer, not including

the Debtor's ownership interest in the Property that he transferred (which, as the Court finds in

Part V.F below, was $17,000.00), was little more than zero.  In the Debtor's deposition, the

Plaintiff questioned the Debtor about what assets he owned on October 13, 2020, and the

Debtor's testimony shows that he owned almost nothing of any value at that time.[41]  The Debtor

fairly summed it up this way:

> Q:  Can you describe what assets you basically owned on October
> 13, 2020?
>
> A:  Nothing.  I didn't own nothing.[42]

And certainly the Debtor's making the 2020 Transfer left him insolvent.  The Debtor

testified about this directly:

> Q:  – on October 13, 2020, after you conveyed your interest in the
> property to your parents, all your debts exceeded the value of all
> your assets, right?
>
> A: Yeah.  Yeah.  My – yes.  Yes.[43]

There is no dispute at all, let alone any genuine dispute, that the Debtor was insolvent

when he made the 2020 Transfer, and that such transfer left him still insolvent.

---

[41] *Id.* at 37-43.

[42] *Id.* at 42.

[43] *Id.* at 43.

16

**E. The Debtor received no "value," so he certainly did not receive "reasonably equivalent value," in exchange for the 2020 Transfer.**

    **1. The Debtor received no "value" in exchange for his 2020 Transfer.**

The concept of "value" is defined in Mich. Comp. Laws Ann. § 566.33(1). That section states, in pertinent part, that "[v]alue is given for a transfer . . . if, in exchange for the transfer . . ., property is transferred or an antecedent debt is secured or satisfied." In this case, the Defendants have repeatedly admitted that the Debtor received no such "value" in exchange for making the 2020 Transfer to the Defendants. In their discovery responses, each of the Defendants admitted that "the Debtor did not receive any money, property or other value from you in exchange for the [Transfer]."[44] And the Defendants' attorney repeated this admission during the hearing on the motions. As the Court finds in Part V.F of this Opinion, below, the value of the Debtor's one-third interest in the Property when he made the 2020 Transfer was $17,000.00. From this, it is clear that in receiving *no value* in exchange for the 2020 Transfer, the Debtor did not receive "reasonably equivalent value."

"Ultimately, a court should consider all the facts and circumstances in making the 'reasonably equivalent value' determination, keeping in mind that any significant disparity between the value received . . . by the debtor-transferor will significantly harm innocent creditors." *Multi-Grinding, Inc. v. Richardson Sales & Consulting Servs., Inc.*, No. 245779, 2004 WL 1335813, at *4 (Mich. Ct. App. June 15, 2004).[45] But where a debtor receives *no value*

---

    [44] Defs.' Resp. To "Corrected" Pl.'s Req. For Admis. (Docket # 16) at 1-2 (Req. To Admit No. 2, Answer to Req. To Admit No. 2).

    [45] The case law cited discussed the meaning of "reasonably equivalent value" under Michigan's Uniform Fraudulent Transfer Act (the "MUFTA"),which became known as the MUVTA (Michigan's Uniform Voidable Transactions Act), effective April 10, 2017. *See* Mich. Comp. Laws § 566.45(1)

17

in exchange for a transfer, the inquiry ends with no consideration of any factors. And "[t]he determination of reasonable equivalence must be made as of the time of the transfer." *Jordan v. Kroneberger* (*In re Jordan*), 392 B.R. 428, 441 (Bankr. D. Idaho 2008) (footnote omitted) (citations omitted).

### 2. The Defendants' position on the reasonably equivalent value element

Although the Defendants admit that the Debtor did not receive *any* value in exchange for the 2020 Transfer, they argue that the Debtor was not entitled to receive any value in exchange for the 2020 Transfer. This is so, according to the Defendants, because the Debtor never contributed any money toward the purchase of the Property. Under these circumstances, the Defendants argue that the equitable doctrines of unjust enrichment and contribution are defenses to the Plaintiff's constructive fraudulent transfer claim, and prevent the Trustee from avoiding the 2020 Transfer and recovering any portion of the sale proceeds for the benefit of the bankruptcy estate. The Defendants argue:

> Even though *legally* the Debtor may have owned the Property, he would nevertheless be unjustly enriched to insist on a portion of the sale proceeds of the Property, because **he was obligated by equity to pay something to the Defendants. The Debtor did not receive the Property without any obligation on his part to make restitution.**
>
> The uncontroverted facts of this case indicate that the Defendants transferred the Property to the Debtor because he needed a place to live. The 2017 [Quit Claim D]eed was executed so that the

---

("This act, which was formerly known and cited as the "uniform fraudulent transfer act", shall be known and may be cited as the "uniform voidable transactions act".). Although various provisions of MUFTA were amended, the definition of "value" under the MUFTA remained the same after the name change. Therefore, case law interpreting "reasonably equivalent value" under the MUFTA is equally applicable to determining the meaning of "reasonably equivalent value" under the MUVTA. Because the 2020 Transfer in this case was made on October 13, 2020, the MUVTA applies.

Property could maintain its status as a homestead and avoid an increase in property taxes. After the Debtor moved out of the Property, he quitclaimed it back to the Defendants to facilitate its sale. He did not ask for payment because he knew he never paid for it. **The Debtor recognized that the Property belonged to the Defendants and that he had no grounds to insist on being paid for transferring it back to them**.
. . . .

In this case, the Defendants made the entire outlay to purchase the Property. **They did not intend the 2017 transfer to be a gift**, as evidenced by the fact that the Property was transferred from the Debtor back to them in 2020, without compensation, three years before he filed his Chapter 7 case. **The expenditures in improving the Property and freeing it from encumbrances were not just unequal, they were made entirely by the Defendants**.[46]

As discussed later in this Opinion, the Defendants' assertions in the above quotation that the Court has put in bold are unsupported by any evidence, and in fact, are refuted by the evidence.

The Defendants argue that their claimed equitable defenses of unjust enrichment and contribution are available under the MUVTA, based on § 566.42 of the MUVTA.[47] That provision states: "Unless displaced by the provisions of this act, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of this act." Mich. Comp. Laws § 566.42.

**3. The Plaintiff's position**

---

[46] Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 30) at pdf pp. 9-11 (emphasis added) (case and record citations omitted).

[47] *Id.* at pdf p. 6.

19

The Plaintiff argues that the Defendants' only asserted defenses to the "reasonably equivalent value" element of the Plaintiff's claim, based on the equitable doctrines of contribution and unjust enrichment, are without merit, for the following reasons, among others:

> First, any claim that the doctrines of contribution and unjust enrichment constitute "value" are displaced by Section 3 of the Michigan Uniform Voidable Transactions Act[, which states, in relevant part, that '[v]alue is given for a transfer . . . if, in exchange for the transfer property is transferred or an antecedent debt is secured or satisfied"]. Second, [the D]efendants never raised the affirmative defense of payment by contribution and/or unjust enrichment under [Mich. Comp. Laws] § 566.42 in their answer to Plaintiff'[s] amended complaint as required by Fed. R. Civ. P. 8(c). (A.P. Docket #15[, and therefore such defenses are waived.] Finally, the [D]efendants already admitted in their response to Plaintiff's discovery that the [D]ebtor did not receive any money, property or other value from them in exchange for the [2020] Transfer [and therefore waived their contribution and unjust enrichment defenses in discovery].[48]

During the hearing on the motions for summary judgment, the Plaintiff's counsel listed additional reasons for rejecting the Defendants' contribution and unjust enrichment arguments. These include the argument that the Defendants had no claim for contribution at the date and time of the 2020 Transfer, because the Defendants did not pay any property taxes or other amount in excess of what the Debtor had paid after he acquired his one-third interest in the Property.[49]

In support of his position that Section 3 of Michigan's Uniform Voidable Transactions Act displaced any possible argument that "the doctrines of contribution and unjust enrichment constitute 'value[,]'" the Plaintiff states:

---

[48] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Docket # 34) at 1-2.

[49] May 1, 2024 Hr'g on Mots. for Summ. J. (Docket # 49) beginning at 46:32.

20

[The] Plaintiff can find no reported case supporting [the D]efendants' position that a defendant can assert contribution or unjust enrichment against a Chapter 7 Trustee on a constructive fraudulent transfer . . . claim. The proffered defense is not recognized as any of the statutory defenses to avoidance set forth in [Mich. Comp. Laws] § 566.38.[50]

**4. The Defendants' March 22, 2017 transfer of a one-third interest in the Property to the Debtor, for no consideration, was a gift, and it made the Debtor the true owner of a one-third ownership interest in the Property.**

The evidence, including the unambiguous language of the 2017 Quit Claim Deed, establishes beyond any genuine dispute that the Defendants' March 22, 2017 transfer of a one-third ownership interest in the Property to the Debtor was a gift, and that it made the Debtor a true owner of a one-third ownership interest in the Property. The Defendants intended to, and did, unconditionally give the Debtor such interest, for no consideration. As will be discussed in Part V.E.5 of this Opinion, below, this point alone substantially undermines the Defendants' contribution and unjust enrichment defenses.

It is well-settled under Michigan law that a parent can effectively transfer an interest in real property to their child for no consideration. *See McDonell v. Erickson,* No. 315343, 2014 WL 2935949, at *6 (Mich. Ct. App. June 26, 2014) ("A deed, intended by a parent to vest title to property in a child as a voluntary gift, requires no pecuniary consideration. *Takacs v. Takacs*, 317 Mich. 72, 82; 26 NW2d 712 (1947)."); *In re JCP Tr.*, No. 352366, 2022 WL 2760225, at *13 (Mich. Ct. App. July 14, 2022), *appeal denied*, 982 N.W.2d 678 (Mich. 2023) ("'It requires less positive and unequivocal testimony to establish the delivery of a gift from a father to his children than it does between persons who are not related, and in cases where there is no suggestion of

---

[50] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Docket # 34) at 2.

fraud or undue influence very slight evidence will suffice.'" *Love v[.] Francis*, 63 Mich 181, 191; 29 NW 843 (1886); *accord* [*Ruch v. First Nat. Bank of Three Rivers*], 326 Mich [52,] 60[, 39 N.W.2d 243-44 (Mich. 1949)] ("a gift from a parent to a child is more easily proved than in instances where such a transaction is between persons not so related.");" *Mannausa v. Mannausa*, 121 N.W.2d 423, 425 (1963) ("[E]ven if we concede plaintiff met the burden of proof [that the child of the deceased did not contribute any of the consideration for the conveyances to deceased and himself as joint tenants,] it would not form a basis for cancellation of [the child's] interest absent a further showing of fraud, coercion, or undue influence. For a parent may convey property to a child without any consideration. *Wroblewski v. Wroblewski*, 329 Mich. 61, 44 N.W.2d 869."); *Mallery v. Van Hoeven*, 52 N.W.2d 341, 342 (Mich. 1952) ("Even if it be shown that no monetary consideration was given by decedent for the property, the consideration of love and affection between parent and child has been held to be adequate by this court. *Takacs v. Takacs*, 317 Mich. 72, 26 N.W.2d 712; *Flood v. Flood*, 295 Mich. 366, 294 N.W. 714; *Meade v. Robinson*, 234 Mich. 322, 208 N.W. 41.").

"Once an *inter vivos* gift is made, it is 'not subject to revocation.'" *In re JCP Tr.*, 2022 WL 2760225, at *12 (citations omitted).

It is clear from the declarations of each of the Defendants that they both intended to make the Debtor a part owner of the Property. They wanted to do this so that they could keep the benefit of the Homestead Exemption, even though they no longer lived at the Property. They knew that such exemption would significantly lower the real estate taxes on the Property, and they wanted that tax benefit. According to each of the Defendants' declarations, an employee of the taxing authority had informed them that since the Defendants no longer lived at the Property,

the only way they could claim the Homestead Exemption was to put the Debtor's (their son's) name on the deed to the Property, and so this is what they did.

In 2017, when the Defendants transferred a one-third interest in the Property to the Debtor, the Homestead Exemption was known as the Principal Residence Exemption (the "PRE"), and it exempted a principal residence "from the tax levied by a local school district for school operating purposes to the extent provided under . . . [Mich. Comp. Laws §] 380.1211, if **an owner** of that principal residence claims an exemption as provided in this section." *See* Mich. Comp. Laws § 211.7cc(1) (effective June 7, 2016) (emphasis added). In order to qualify for the PRE in real property, the person claiming the exemption had to be **an owner** of that property; the property had to be occupied as the principal residence **of the owner**; and **the owner** had to file an affidavit "on a form prescribed the department of treasury" "stat[ing] that the property **is owned** and occupied as a principal residence **by that owner** of the property on the date that the affidavit is signed." Mich. Comp. Laws § 211.7cc(2) (emphasis added). "A person who [was] a partial owner of the property" was an owner, within the meaning of the statute. *See* Mich. Comp. Law 211.dd(a)(*i*) (effective June 30, 2015). Under the statute, "'[p]rincipal residence' means the 1 place where **an owner** of the property has his or her true, fixed, and permanent home to which, whenever absent, he or she intends to return and that shall continue as a principal residence until another principal residence is established." Mich. Comp. Laws § 211.7dd(c) (emphasis added). Therefore, if the Defendants made the Debtor (their son) a part owner of the Property, he could claim the PRE, because he was occupying the Property as his principal residence, and he could obtain a significant tax savings for all the owners of the Property — *i.e.*, the Debtor and the Defendants.

23

It is clear, based on the undisputed evidence in the record, that, acting based on what the taxing authority employee had told them, the Defendants intended to give the Debtor a true ownership interest in the Property, so that the Debtor would be able to validly claim the PRE, and obtain a significant tax savings for themselves and the Debtor.

Not only did the Defendants intend to give the Debtor a one-third ownership interest in the Property, but also they did, in fact, do so. They did so by (1) hiring an attorney to draft the 2017 Quit Claim Deed using the statutory form,[51] which deed clearly and unambiguously transferred a one-third interest in the Property to the Debtor; (2) signing that deed; (3) having the deed sealed and acknowledged; and (4) delivering and recording that deed with the register of deeds in the county where the Property was located. And the Debtor accepted the Deed.[52] Under Michigan law, this was effective to make the Debtor a one-third owner of the Property. Under Michigan law,

> [c]onveyances of lands, or of any estate or interest therein, may be made by deed, signed and sealed by the person from whom the estate or interest is intended to pass, being of lawful age, or by his lawful agent or attorney, and acknowledged or proved and recorded as directed in this chapter, without any other act or ceremony whatever.

Mich. Comp. Laws § 565.1; *see also* Mich. Comp. Laws § 565.152 ("Any conveyance of lands worded in substance as follows: 'A.B. quit claims to C.D. (here describe the premises) for the sum of (here insert the consideration),' the said conveyance, being duly signed, sealed, and

---

[51] The same attorney, Peter M. Mianecki, drafted both the 2017 Quit Claim Deed and the 2020 Quit Claim Deed. This is stated on the face of each of the deeds. The Debtor testified that he did not hire this attorney, so the attorney must have been hired by the Defendants. (*See* Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 30-31).

[52] *Id.* at 22.

acknowledged by the grantor, shall be deemed to be a good and sufficient conveyance in quit claim to the grantee, his heirs, and assigns.").

During the hearing on the motions for summary judgment, the Defendants' attorney admitted that the 2017 transfer made the Debtor a one-third owner of the Property; and that because the transfer to the Debtor of a one-third interest in the Property was for no consideration, it was a gift. But the Defendants' attorney argued that it was a "conditional gift," made on the condition that if the Debtor moved out of the Property, he would transfer his one-third interest in the Property back to the Defendants. The Court must reject this argument. There is no evidence whatsoever to support this assertion by the Defendants' attorney. There is no documentary evidence that supports it, and there is nothing at all in the Defendants' declarations that support it. And the Debtor testified that the Defendants never said anything to him about why they were deeding the Property to him; rather, the Debtor testified that "they just asked me" about transferring the Property, and the Debtor agreed to it.[53] And the Debtor also admitted in his

---

[53] The Debtor testified as follows:

> Q: . . . Why did your parents deed the house to you like that? Do you recall? Do you know?
> . . . .
>
> A: . . . They just asked me, so I said yes.
>
> Q: . . . But do you know why they deeded that to you?
>
> A: No.
>
> Q: They never said anything to you?
>
> A: No. . . . They just asked me.

(Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 73).

deposition that after the 2017 transfer, he had an ownership interest in the Property.[54]

The language in the 2017 Quit Claim Deed was unambiguous and absolute. The 2017 Quit Claim Deed contained no conditions, limitations, or restrictions on the interest being conveyed to the Debtor. And the Defendants have expressly disclaimed any argument that the Debtor's one-third ownership of the Property was subject to any sort of equitable trust in favor of the Defendants.[55] After the 2017 transfer, the Debtor owned the Property jointly with his parents, as a true one-third owner, with no strings attached.

There is another reason why the Defendants cannot genuinely dispute that, in 2017, they unconditionally made the Debtor a one-third owner of the Property. The Defendants are precluded from arguing otherwise by the doctrine of unclean hands. For the Defendants to argue otherwise would be tantamount to saying that they engaged in a sham, fraudulent tax evasion scheme, designed to make it appear to the taxing authorities that they were entitled to the PRE (homestead exemption) (because their son who lived at the Property was one of its owners), when really the Defendants were *not* entitled to the PRE (because their son was *not* really an owner of the Property). If the Defendants took such a position, it would be barred by the Michigan doctrine of unclean hands.[56]

---

[54]  *See id.* at 31-32.

[55]  *See* Defs.' Br. in Opp'n. to Mot. for Summ. J. (Docket # 31) at pdf p. 7. Because of this disclaimer, it is unnecessary to discuss why such an equitable trust argument is untenable under Michigan law.

[56]  Under Michigan law,

> The unclean-hands doctrine is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [opposing party]." *Rose v. Nat'l Auction*

26

Fortunately for the Defendants, they disclaim any such unclean position. During the

hearing on the summary judgment motions, the Defendants' attorney conceded that the 2017

transfer made the Debtor a true one-third owner of the Property. There is no genuine dispute

about this.

**5. The Defendants had no right to contribution from the Debtor, under the Michigan doctrine of contribution.**

The particular doctrine of contribution under Michigan law that the Defendants rely on is

described as follows:

> Contribution is an equitable remedy based on principles of natural justice.
> *Lorimer v. Julius Knack Coal Co.*, 246 Mich. 214, 217, 224 N.W. 362
> (1929). *In Caldwell v. Fox*, 394 Mich. 401, 417, 231 N.W.2d 46 (1975),
> this Court explained:
>
> > The general rule of contribution is that one who is
> > compelled to pay or satisfy the whole *or to bear*

---

*Group*, 466 Mich. 453, 463, 646 N.W.2d 455 (2002) (citations and quotation marks omitted). Any willful act that transgresses equitable standards of conduct is sufficient to allow a court to deny a party equitable relief. *Stachnik v. Winkel*, 394 Mich. 375, 386, 230 N.W.2d 529 (1975).

*New Prod. Corp. v. Harbor Shores BHBT Land Dev., LLC*, 953 N.W.2d 476, 484 (Mich. Ct. App. 2019).

Here, unclean hands would bar the Defendants' defense, *if* the Defendants took the position that they executed and recorded the 2017 Quit Claim Deed, not in order to actually give their son (the Debtor) an ownership interest in the Property, but solely in order to create a false impression to the taxing authorities that the Debtor was a part owner of the Property (when he really was not), in order to obtain the homestead exemption and avoid paying real estate taxes that they were legally obligated to pay.

In that event, the Defendants would be guilty of a tax scam, designed to cheat the taxing authorities out of money the Defendants rightly owed for real estate taxes. The unclean hands doctrine would preclude the Defendants from denying the Debtor's one-third ownership of the Property. Under such a scenario, the Defendants would have obtained significant tax savings over more than 4 years (from March 22, 2017 to September 8, 2020) due to a misrepresentation of the ownership of the Property to the taxing authorities. "'Under such circumstances, a court of equity will not lend its aid to the parties to the fraud.' 'They will be left by the Court in the situation in which they have placed themselves.'" *McFerren v. B & B Inv. Grp.*, 655 N.W.2d 779, 783-84 (2002) (citation omitted).

27

> *more than his aliquot share of the common burden or obligation*, upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares. [Emphasis added.]

*Tkachik v. Mandeville*, 790 N.W.2d 260, 265–66 (Mich. 2010) (italics in original).

The Defendants argue that under this equitable doctrine of contribution, the Debtor was not entitled to any of the proceeds from the sale of the Property because "the Debtor never paid anything toward either the purchase of the Property in 1990, or the transfer of the Property that took place in 2017."[57] And according to the Defendants, while living on the Property, the Debtor only paid rent "spordically and [such rent] totaled less than $1,000.00."[58] The Defendants allege that because the Debtor never paid his proportional share for the acquisition of the Property, for the cost of preserving and improving the Property, or for his possession and use of the Property, the Defendants have a right to assert the doctrine of contribution as a defense to the Plaintiff's constructive fraudulent transfer claim.

The Defendants did not allege, or present any evidence, that they did anything or paid anything to preserve or improve the Property after the 2017 transfer of an ownership interest in the Property to the Debtor. Nor did the Defendants quantify what they believe was the Debtor's proportional share of any such unproven costs. Nor did the Defendants state the amount of rent that they allege the Debtor owed to them, or provide any evidence that they even had an agreement requiring the Debtor to pay rent.

---

[57] Defs.'s Br. in Supp. of Mot. for Summ. J. (Docket # 30) at pdf p. 8.

[58] *Id.*

28

The Court must reject the Defendants' contribution defense.  The Court will assume, at least for discussion purposes, that the doctrine of contribution can be used as a defense to a trustee's constructive fraudulent transfer claim.  Even under this assumption, the Defendants have not established any right to contribution from the Debtor.  To the contrary, the undisputed evidence shows that the Defendants have no such right to contribution under Michigan law.

Initially, the Court notes that the Defendants had purchased the Property, and paid off the mortgage(s) on the Property, by no later than 2009, long before they gave the Debtor a one-third interest in the Property in 2017.  And because the Defendants' 2017 transfer of the Property to the Debtor was a gift, the Debtor had no duty to pay the Defendants anything for his one-third ownership interest.

Before the Defendants transferred an interest in the Property to the Debtor in 2017, there was no common burden or obligation that the Defendants and the Debtor had regarding the Property.  Before the 2017 transfer, the Debtor had no legal obligation to make any mortgage payments on the Property or to pay anything towards the purchase, preservation and/or improvement of the Property, because he had no ownership interest in the Property.  It was only *after* the Debtor became a one-third owner of the Property, as a result of the 2017 Quit Claim Deed, that the Debtor might have had any common obligation with the Defendants whatsoever with regard to the Property.  Only then could the Debtor have had any possible obligation to contribute his proportional share (one third) of the expenses to maintain and preserve the Property.

As to those expenses, the undisputed evidence shows that it was *the Debtor*, not the Defendants, who actually paid more than his proportional share of the common burden or

obligations regarding the Property for the 2017-2020 time period when the Debtor was a part owner.

First, the major common legal obligation that the Debtor had with the Defendants, after he became a one-third owner of the Property, was to pay the real estate taxes on the Property. The undisputed evidence shows that for the 2017-2020 time period during which the Debtor was a part owner of the Property, the Debtor paid more than his proportional share of the real estate taxes. It is undisputed that the Debtor and his wife paid the full amount owing for the real estate taxes on the Property for the 2017 and 2018 tax years, totaling $5,630.23. By contrast, the Defendants eventually paid the real estate taxes for the Property for tax years 2019 and 2020, in the total amount of $4,789.76, at the closing of the sale on the Property in 2020 (and they also paid a water bill in the amount of $966.24, discussed below). This means that for the period of time in which the Debtor was a one-third owner of the Property (part of 2017 through part of 2020), the Defendants and the Debtor together paid a total of $10,419.99 on their common obligation, as owners of the Property, for real estate taxes on the Property. The Debtor's share of this total tax obligation amount was one-third of it, or $3,473.33, based on his one-third ownership interest in the Property, but he paid $5,630.23, or 54.03% of the common obligation. By contrast, the Defendants, as two-thirds owners, paid only 45.97% of the common obligation. So the Debtor paid far more than the one-third share of the real estate taxes that he could possibly have been obligated to pay under the Michigan contribution doctrine.

If one factors in the $966.24 water bill that the Defendants paid when they sold the

Property in 2020, the total expenses for the Property becomes $11,386.23, at most,[59] and the Debtor owed only 33.33% of those common obligations based on his one-third ownership interest. But the Debtor paid 49.45% of those obligations, while the Defendants owed 66.66% of those obligations and only paid 50.55%.

Therefore, the Debtor actually paid much more than his proportional share of the common obligations, and the Defendants have no claim for contribution.

While it is not entirely clear, it may be that the Defendants also allege that they have a contribution claim based on the Debtor's failure to pay them rent for the Property. The Court disagrees.

First, the Defendants have not presented any evidence that the Debtor ever had any obligation to pay them rent. They admit that there is no lease or any other written agreement under which the Debtor was obligated to pay them rent. And under Michigan's statute of frauds, leases that exceed one year must be in writing. *See* Mich. Comp. Laws § 566.106. And there is no evidence even of any oral agreement by the Debtor to pay rent to the Defendants, in the Defendants' declarations, or in the deposition testimony of the Debtor, or anywhere else in the record.

Second, after the Debtor became a joint owner of the Property, he had no obligation to pay rent, under Michigan law. "'One cotenant may not recover rent from another cotenant who

---

[59] This $11,386.23 amount was calculated by adding the $966.24 paid by the Defendants in 2020 for the water bill to the amount the parties paid for the taxes for the years 2017-2020. There is no evidence in the record that the Defendants paid any other utility expenses for the Property for the 2017-2020 time period when the Debtor was a one-third owner of the Property. To the contrary, the Debtor testified that *he* paid the utility bills for the Property. (*See* Dep. Tr. of Terry Wall, Jr. (Docket # 27-2 (Ex. A to Pl.'s Mot. for Summ. J.)) at 23-24).

with his consent occupied the premises owned in common.'" *Olson v. Bosanac*, No. 341478, 2018 WL 6709362, at *7 (Mich. Ct. App. Dec. 20, 2018) (quoting *Frenzel v. Hayes*, 219 N.W. 740, 742 (Mich. 1928)).

Third, even if the Debtor had made an agreement with the Defendants to pay them rent, such a contractual obligation would have run only from the Debtor to the Defendants. It was not a common obligation that all the owners of the Property had to an outside person or entity. Collectively, the three joint owners of the Property in this case (the two Defendants and the Debtor) did not owe any rent to any third party; and in fact, none of them owed rent to any third party. So the Michigan contribution doctrine relied on by the Defendants could not apply to any rent obligation, even if the Debtor had made an agreement to pay rent to the Defendants.

As the contribution concept is defined in the *Tkachik* case, quoted above, it applies only when one property owner pays "more than his aliquot share" of a "common burden or obligation" for which the other owners are "equally liable or which they are bound to discharge." *Tkachik*, 790 N.W.2d at 265-66 (citations omitted); *see also Comstock v. Potter*, 158 N.W. 102, 105 (Mich. 1916) (citation omitted) ("[O]ne who has paid more than his share of the joint obligation may recover contribution from his co-contractors.").[60]

---

[60] In addition to their argument about rent, the Defendants allege that "[p]art of the agreement to allow [the Debtor] to live at the Property was that the property taxes would be paid by him." (Am. Decl. of Terry Lee Wall, Sr. (Docket # 42) at pdf p. 2 ¶ 29; Am. Decl. of Judith A. Wall (Docket # 43) at pdf p. 2 ¶ 29). This is inconsistent with the testimony of the Debtor, who said that he did not discuss the 2017 transfer of the Property with his parents, other than to agree to accept the transfer. *See supra* note 53. But even if the Debtor had made an agreement with the Defendants to pay all the taxes, that would have created at most only a contractual obligation running from the Debtor to the Defendants. Such an obligation, like the alleged rent obligation, would not have been a "common obligation" — *i.e.*, an obligation that the three owners of the Property together owed to a third party (here, the taxing authority). So any failure by the Debtor to pay some of the property taxes for the period when he was a part owner of the Property could not support any contribution claim by the Defendants, *unless* the Debtor failed to

Based on the undisputed facts described above, it is clear that the Debtor paid far more than his one-third share of the common obligations owed by the three owners of the Property, for the 2017-2020 time period when the Debtor was a one-third owner of the Property. As a result, the Defendants clearly have no claim for contribution under Michigan law.

**6.    The Court must reject the Defendants' argument that the Debtor would be unjustly enriched if the Court finds that he was entitled to one third of proceeds from the sale of the Property.**

The Defendants argue that:

> Even though *legally* the Debtor may have owned the Property, he would nevertheless be unjustly enriched to insist on a portion of the sale proceeds of the Property, because he was obligated by *equity* to pay something to the Defendants. The Debtor did not receive the Property without any obligation on his part to make restitution.[61]

The Court disagrees. The Defendants' unjust enrichment argument fails, first and foremost, because the Defendants' contribution argument fails, as discussed above. The Defendants' unjust enrichment argument is based on their contribution argument. But the Defendants' unjust enrichment argument fails for the following additional reasons.

"Unjust enrichment is defined as the unjust retention of 'money or benefits which in justice and equity belong to another.' 'No person is unjustly enriched unless the retention of the benefit would be unjust.'" *Tkachik*, 790 N.W.2d at 266 (citations omitted).

First and foremost, the Defendants voluntarily gave to their son, the Debtor, for nothing, a

---

pay at least his one-third share of the three owners' common tax obligation to the taxing authority. As discussed above, the Debtor paid far more than a one-third share of the property taxes for the 2017-2020 period when the Debtor was a one-third owner of the Property.

[61] Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 30) at pdf p. 9 (italics in original) (citation omitted).

33

one-third ownership of the Property in 2017. And as noted above, once given, that gift was not revocable. *See In re JCP Tr.*, 2022 WL 2760225, at *12 (citations omitted). There could be nothing "unjust" about the Debtor retaining the benefit of that gift.

Second, the Defendants "unjust enrichment" argument ignores the benefits *the Defendants* received from giving the Debtor a one-third ownership interest in the Property.

Here, the Defendants voluntarily transferred a one-third ownership in the Property to the Debtor so that they and the Debtor could obtain the benefit of the Debtor claiming the PRE (homestead exemption), resulting in a significant real estate tax savings for themselves and the Debtor from 2017 through 2020. The Defendants were enriched by making the 2017 transfer, by having their tax obligation on the Property substantially reduced from what it would have been. And this is so even though the Debtor and his wife actually ended up paying the real estate taxes for 2017 and 2018, because the Defendants paid the 2019 and 2020 taxes, out of the proceeds of their 2020 sale of the Property. And the Defendants also benefitted from the Debtor's payment of 100% of the real estate taxes for 2017 and 2018, even though the Defendants were the two-thirds owners of the Property for those years.

It is not unjust to hold Defendants accountable for the legal ramifications of what they voluntarily did, after obtaining legal advice — at a minimum from the attorney they hired to draft the 2017 Quit Claim Deed — and after they obtained significant monetary benefits from their actions. The retention of any benefit by the Debtor on account of the Defendants' 2017 transfer of a one-third interest in the Property to the Debtor would not be unjust under these circumstances.

**7. The Defendants may not rely on vague notions of fairness to circumvent the**

**provisions of the MUVTA.**

Having failed to meet the requirements of the Michigan doctrines of contribution and unjust enrichment, the Defendants are left with the argument that it would be unfair for the Trustee to use the MUVTA to avoid the Debtor's 2020 Transfer and thereby require the Defendants to pay back one third of the value of the Property. But this vague fairness argument fails. First, it ignores the fact that the Defendants themselves chose in 2017 to make a gift to the Debtor of a one-third interest in the Property.

Second, under Michigan law the Defendants may not rely on general notions of fairness to circumvent the provisions of the MUVTA. That is not permitted under Mich. Comp. Laws § 566.42, relied on by the Defendants. That section's reference to the application of "the principles of law and equity," as supplementing the MUVTA's provisions, does not permit courts to reject avoidance actions merely based on notions of fairness. As the Michigan Court of Appeals pointed out in *Simon v. Gebremariam*, No. 353312, 2020 WL 10142203, at *6 (Mich. Ct. App. Dec. 10, 2020) (footnote omitted):

> [W]e agree with plaintiff's contention that the trial court made a
> number of vague appeals to generalized fairness, and that it seems
> to have overly relied on those ideas to circumvent any actual
> application of the MUVTA, which plainly is not what MCL 556.42
> permits. Again, a trial court may not engage in a vague balancing
> of the equities on the basis of subjective feelings about what is fair
> under the circumstances. See *Devillers* [*v. Auto Club Ins. Ass'n*],
> 473 Mich. [562,] 591[,] 702 N.W.2d 539[, 556-57 (2005)]. See
> also *Lansing v. Lansing Twp*., 356 Mich. 641, 650; 97 N.W.2d 804
> (1959) ("Courts of equity, as well as of law, must apply legislative
> enactments in accord with the plain intent of the legislature. An
> argument that a statute as construed may in certain circumstances
> work great hardship is one that should be addressed to the
> legislature rather than the court.")

35

**F. The value of the property transferred by the Debtor to the Defendants in the 2020 Transfer was $17,000.00.**

The Trustee has established, based on the undisputed evidence in the record: (1) that at the time of the 2020 Transfer, the value of the Debtor's one-third interest in the Property that he transferred to the Defendants was equal to one-third of the 2020 sale proceeds of $51,000.00, or $17,000.00.

**G. The Trustee is entitled to recover $17,000.00 from the Defendants under 11 U.S.C. § 550.**

Because the Trustee has established all of the elements of his constructive fraudulent transfer claims under 11 U.S.C. § 544(b)(1) and Mich. Comp. Laws § 566.35(1), the 2020 Transfer is avoidable, and the value of the Transfer may be recovered from each of the Defendants under 11 U.S.C. § 550(a)(1). That provision states: "[With exceptions not applicable here], to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, **the value of such property**, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]" 11 U.S.C.A. § 550(a)(1) (emphasis added). Each of the Defendants was an initial transferee of the Transfer, which was made by the 2020 Quit Claim Deed, and therefore, under 11 U.S.C. § 550(a)(1), the Plaintiff is entitled to recover $17,000.00 (the value of the Debtor's one-third interest in the Property) from the Defendants, jointly and severally.

**H. The Court will deny the Plaintiff's request for sanctions under 28 U.S.C. § 1927**.

In addition to a money judgment against the Defendants, the Plaintiff seeks sanctions against the Defendants' attorney under 28 U.S.C. § 1927, based on the Defendants' filing and prosecuting, through their attorney, of what the Plaintiff deems to be frivolous defenses to the

Plaintiff's constructive fraudulent transfer claims, and based on the Defendants' filing, though

their attorney, initial declarations under penalty of perjury (later corrected), falsely stating that the

Defendants paid the 2018 real estate taxes on the Property.

Section 1927 of Title 28 states:

> Any attorney or other person admitted to conduct cases in any court of the
> United States or any Territory thereof who so multiplies the proceedings in
> any case unreasonably and vexatiously may be required by the court to
> satisfy personally the excess costs, expenses, and attorneys' fees
> reasonably incurred because of such conduct.

28 U.S.C. § 1927.

> Section 1927 sanctions are warranted when an attorney objectively "falls
> short of the obligations owed by a member of the bar to the court and
> which, as a result, causes additional expense to the opposing party." *Ruben
> v. Warren City Sch.*, 825 F.2d 977, 984 (6th Cir.1987). The purpose is to
> deter dilatory litigation practices and to punish aggressive tactics that far
> exceed zealous advocacy. *See Jones v. Continental Corp.*, 789 F.2d 1225,
> 1230–31 (6th Cir.1986). A sanctioned attorney is thus required to
> personally satisfy the excess costs attributable to his misconduct. *See In re
> Ruben*, 825 F.2d 977, 983 (6th Cir.1987).

> Furthermore, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766–67, 100
> S.Ct. 2455, 65 L.Ed.2d 488(1980), held that federal courts have the
> inherent power to assess attorney's fees against counsel who willfully
> abuse judicial processes or who otherwise act in bad faith. However,
> unlike sanctions imposed under a court's inherent authority, § 1927
> sanctions require a showing of something less than subjective bad faith,
> but something more than negligence or incompetence. *See In Re Rubin*,
> 825 F.2d at 984; *Jones*, 789 F.2d at 1230 ("we hold that 28 U.S.C. § 1927
> authorizes a court to assess fees against an attorney for 'unreasonable and
> vexatious' multiplication of litigation despite the absence of any conscious
> impropriety."). Thus, an attorney is sanctionable when he intentionally
> abuses the judicial process or knowingly disregards the risk that his actions
> will needlessly multiply proceedings. *See United States v. Wallace*, 964
> F.2d 1214, 1220 (D.C.Cir.1992) (observing that recklessness is a lower
> standard than bad faith, requiring "deliberate action in the face of a known
> risk, the likelihood or impact of which the actor unexcusably [sic]
> underestimates or ignores.").

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006);

*see also In re Gorges*, 590 B.R. 771, 788-90 (Bankr. E.D. Mich. 2018); *In re Sharkey*, 563 B.R.

655, 670-72 (Bankr. E.D. Mich. 2017).

The Court concludes that the standard for awarding sanctions under 28 U.S.C. § 1927 has

not been met in this case. First, although the Defendants did not prevail on their defenses, the

Court does not find such defenses to have been frivolous.

Second, the Court concludes that although the Defendants' attorney filed initial

declarations of each of the Defendants under penalty of perjury, which falsely stated that the

Defendants paid the 2018 real estate taxes, the Defendants' attorney did not intend to present

false statements to the Court. Rather, the attorney relied on the (incorrect) recollection of his

clients, the Defendants, that they had paid the 2018 real estate taxes. This was a mistake that the

Defendants' attorney certainly should have avoided. Indeed, before the Defendants' false

statements were filed, the Defendants' attorney himself had turned over to the Plaintiff the very

documents that proved that the Defendants' statements at issue were false. While the

Defendants' attorney certainly made a mistake he should not have made, the Court finds that it

was an innocent mistake. And the Defendants' attorney promptly had the Defendants file

amended declarations when he realized the falsity of the initial declarations.

The Court concludes that the attorney for the Defendants did not unreasonably and

vexatiously multiply the proceedings in this case. The Court declines to award any sanctions

against the Defendants' attorney under 28 U.S.C. § 1927.

## VI. Conclusion

For the reasons stated in this Opinion, the Court will enter an order:

1. granting the Plaintiff's motion for summary judgment;

2. denying the Defendants' motion for summary judgment;

3. granting judgment on Count I of the Plaintiff's amended complaint (Docket # 13), in favor of the Plaintiff and against the Defendants, avoiding the 2020 Transfer based on the combination of 11 U.S.C. § 544(b)(1) and Mich. Comp. Laws § 566.35(1).

4. granting a money judgment on Count I of the Trustee's amended complain in the amount of $17,000.00 in favor of the Plaintiff, and against the Defendants, jointly and severally;

5. dismissing Count I of the Trustee's amended complaint, with prejudice, to the extent it seeks avoidance and recovery of the 2020 Transfer, as an intentional fraudulent transfer based on 11 U.S.C. § 544(b)(1) and Mich. Comp. Laws § 566.34(1)(a);

6. dismissing Count I of the Trustee's amended complaint, without prejudice and as moot, to the extent it seeks avoidance and recovery of the 2020 Transfer, as an constructively fraudulent transfer based on 11 U.S.C. § 544(b)(1) and Mich. Comp. Laws § 566.34(1)(b); and

7. denying the Plaintiff's request for sanctions under 28 U.S.C. § 1927.

**Signed on June 21, 2024**



/s/ **Thomas J. Tucker**
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**